UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

      -against-                                          14 CR 810-07 (CM)

GANEENE GOODE,

              Defendant.
------------------------------------------------------------X

## DECISION AND ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

McMahon, C.J.:

Ganeene Goode was charged along with ten co-defendants with conspiring to distribute millions of oxycodone tablets, through sham clinics and pain management facilities in New York. Goode pleaded guilty and was sentenced to 48 months' imprisonment. She is presently serving her sentence at the Bureau of Prisons medical facility in Fort Worth Texas. She has served approximately 18 months—her projected release date, with good time credit, is July 29, 2021.

Before the Court is Goode's motion for compassionate release, filed pursuant to 18 U.S.C. § 3582 and the First Step Act. The Government opposes the motion.

Goode's motion is denied.

### The Compassionate Release Statute

A court may not modify a term of imprisonment once it has been imposed except pursuant to statute.

Until last December, a court could not modify a defendant's duly-imposed sentence on compassionate release grounds unless it received a motion from the Bureau of Prisons asking

1

that the court consider such modification. 18 U.S.C.A. § 1B1.13. Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement) (Effective November 1, 2006; amended effective November 1, 2007; November 1, 2010; November 1, 2016; November 1, 2018).

In December 2018, as part of the First Step Act, Congress worked a change to that rule of long standing. A court may now consider a motion for compassionate release made by a defendant who has exhausted his administrative remedies by petitioning the Director of the BOP to make such a motion, assuming the Director fails to act on the inmate's request within thirty days:

> [T]he court, ... upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, *may reduce the term of imprisonment* . . .

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

The court may modify a sentence on compassionate release grounds only:

after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13. It provides that the Court may reduce the term of imprisonment only if three conditions are met:

(i)   extraordinary and compelling reasons warrant the reduction, *id.* § 1B1.13(1)(A);

(ii)  the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g), *id.* § 1B1.13(2); and

(iii) "the reduction is consistent with this policy statement. *id.* § 1B1.13(3).

The Application Notes describe the circumstances under which "extraordinary and compelling reasons exist." *Id.* § 1B1.13 Application Note 1. One of those is the defendant's medical condition:

> (A) Medical Condition of the Defendant.—
>
> . . .
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 Application Note 1(A). Goode's motion is predicated on her medical condition, which she contends has deteriorated substantially since she was first incarcerated.

According to a Program Statement issued by the BOP after passage of the First Step Act, a defendant may be considered for a reduced sentence based on a his/her medical condition only if s/he

> (i) has an "incurable, progressive illness" or has "suffered a debilitating injury from which [he] will not recover;"
>
> (ii) is "[c]ompletely disabled, meaning the [defendant] cannot carry on any self-care and is being totally confined to a bed or chair'" or
>
> (iii) is "[c]apable of only limited self-care and ... confined to a bed or chair more than 50% of waking hours."

U.S. Department of Justice, Federal Bureau of Prisons, Program Statement, OPI OGC/LCI, Number 5050.50, January 17, 2019, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), at 5.

3

It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. She is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

This is a case in which the defendant's medical situation, debilitated though she be, does not reach the level at which BOP Guidelines suggest consideration for compassionate release.

## Background Facts

Goode was charged along with ten co-defendants with one count of conspiring to distribute narcotics by Indictment 14 Cr. 810 (CM), which was unsealed on December 11, 2014. (PSR ¶¶ 1-2.) The charge stems from the defendant's participation in a massive oxycodone distribution scheme, one which was centered at a purported pain management office located in upper Manhattan and run by co-defendant Dr. Moshe Mirilashvili (the "Clinic"). As detailed further below, the defendant worked with others to run a crew of "patients" who saw Mirilashvili at the Clinic – as well as at other sham medical clinics in the city – and received medically unnecessary oxycodone prescriptions which the defendant and her co-conspirators then caused to be filled so the oxycodone tablets could be sold. (*Id.* ¶¶ 15-29.)

### A. Background of the Investigation

The conspiracy charged in the Indictment involved the unlawful diversion and trafficking of millions of oxycodone tablets. The operations of the alleged drug distribution

4

ring were centered at the Clinic as well as two other sham pain management facilities in New York, including a Clinic on Southern Boulevard in the Bronx (the "Southern Boulevard Office,") and another in upper Manhattan (the "Doctor-3 Office"). The conspiracy involved medical doctors, including co-defendant Mirilashvili, Clinic employees, and drug traffickers who managed crews of "patients," sending them into the Clinic to obtain medically unnecessary prescriptions. (*Id.* ¶¶ 17-19.)

The Clinic – and Mirilashvili's practice more generally - bore little resemblance to a standard medical office. For example, on a daily basis, crowds would gather outside the Clinic, sometimes even fighting for an opportunity to see Mirilashvili to obtain a medically unnecessary prescription. Once inside, the "patients" would pay Mirilashvili himself $200 to $300 in cash and virtually always receive an identical prescription for 90 30-milligram oxycodone tablets.

The majority of these individuals had no medical need for oxycodone, or any legitimate medical record documenting an ailment for which oxycodone would be prescribed. Instead, most of these individuals were members of "crews" – that is, they were recruited and paid by high-level drug traffickers (the "Crew Chiefs"), including the defendant, to pose as "patients" in order to receive medically unnecessary prescriptions from Mirilashvili. The Crew Chiefs then arranged for and oversaw the filling of the resulting prescription at various pharmacies and took possession of the oxycodone pills for resale. Crew Chiefs also paid or bribed the Clinic's employees to get their Crew Members into the Clinic to see Mirilashvili so that they could obtain medically unnecessary oxycodone prescriptions. (*Id.* ¶¶ 18-19.)

To maximize their profits, many Crew Chiefs sent their crews of patients not only to

5

see Mirilashvili but to see other licensed doctors in New York City willing to write medically unnecessary oxycodone prescriptions in return for cash payments, including Dr. Robert Terdiman, the primary doctor at the Southern Boulevard Office (identified in the Indictment as "Doctor-2"), and Dr. Rogelio Lucas, the primary doctor at the Doctor-3 Office (identified in the Indictment as "Doctor-3"). (*Id.* ¶¶ 20-21.).

In total, between in or around October 2012 and in or around December 2014, Mirilashvili wrote more than 13,000 medically unnecessary prescriptions for oxycodone, resulting in the issuance of approximately 1.2 million oxycodone pills. (*Id.* ¶ 12.) During roughly the same time period, Doctor-2 wrote approximately 17,000 medically unnecessary oxycodone prescriptions, while Doctor-2 wrote approximately 15,000 medically unnecessary oxycodone prescriptions. (*Id.* ¶ 20.)

B. The Defendant's Role

This defendant worked primarily as a Crew Chief, running a crew of patients into the Clinic for the purpose of obtaining and then reselling tens of thousands of medically unnecessary oxycodone tablets. Like many of the Crew Chiefs, this defendant was also typically involved in creating or purchasing the sort of false and fraudulent paperwork his "patients" and other co- conspirators would need to get the medically unnecessary prescriptions, including fake MRI reports, urinalysis reports, and the like.

As alleged in the Indictment, and confirmed by surveillance photos, witness testimony, and prescription records, the defendant and her Crew operated not only at the Clinic but also at several additional sham medical clinics in the City. In particular, the defendant sent her "patients" to see both Dr. Terdiman (referred to as "Doctor-2" in the Indictment) and Dr. Lucas (referred to as "Doctor-3). By so doing, the defendant maximized

6

her profits by obtaining multiple medically unnecessary oxycodone prescriptions each month so that the pills could in turn be resold on the streets of New York.

As part of the offense conduct, Goode also posed as a patient herself, seeing Dr. Lucas from July 2013 until her arrest. While Goode was never a "patient" of Mirilashvili's, she was a regular presence at the Clinic, sending in "patients" and collecting and filling the medically unnecessary prescriptions issued by Mirilashvili until his arrest in December 2014.

On November 12, 2015, the defendant pled guilty to the sole count of the Indictment pursuant to a plea agreement with the Government. As a part of that agreement, the parties agreed that the defendant's conduct involved the distribution of at least 4,320 30-milligram oxycodone tablets, a figure which represents all of the oxycodone tablets obtained by the defendant in her own name, as well as at least some of those obtained on the defendant's behalf by members of her "crew."

C. Sentencing

As a condition of the parties' plea agreement, the defendant agreed that she was a career offender within the meaning of the U.S. Sentencing Guidelines and had an applicable Guidelines range of 151 to 188 months' imprisonment. In light of her mental and physical health, among other factors, and taking into account the defendant's extensive criminal history and the seriousness of the offense conduct, the Probation Department recommended a sentence of 120 months' imprisonment.

According to the PSR, Goode was first diagnosed with kidney failure in 2015, or after her participation in the charge conduct began. (PSR ¶ 87.) Her sentencing submission included correspondence from a treating physician that described the condition as "hypertension complicated by Stage V Chronic Kidney Disease," and that due to her "extremely

7

impaired Renal Function, she is approaching End Stage Renal Disease." (Ex. E to Sentencing Submission). As the sentencing date approached, Goode was in need of dialysis multiple times each week to maintain her kidney function. Indeed, sentencing was adjourned several times over nine months at defendant's request to accommodate her ongoing medical care.

When Goode finally appeared for sentence, she pleaded with the Court to spare her a prison sentence: "I am trying to get a kidney. My family will give me one. They don't do it in the BOP." (Tr. 10). While I did not grant her request to completely avoid a term of imprisonment, I sentence her to a significantly lesser period of incarceration than I was inclined to do for someone with her level of culpability. As I said at the time of sentence, many similarly situated co-defendants had received sentences of up to 120 months' imprisonment, "[y]our peculiar circumstance is that you have a disease that is fatal unless treated, treated properly and appropriately, and while I know that there are fine medical facilities run by the Bureau of Prisons, I am also aware of the fact that you will probably get better medical care out here than you would get in there." (Tr. 12-13). However, I ultimately concluded that:

> I can't see my way clear to saying you're done, time-served, I can't do it. The crime is too serious. What I am going to propose is sentencing you to a below-guidelines sentence and setting a very long surrender date, like maybe six months or a year, while we work out this kidney transplant thing, in the hope that we can have you off dialysis before you have to do time. I think that's in a world of really bad alternatives, I think that is the best alternative I can come up with. . . .
>
> I am under no illusion that giving a long surrender date in the hope you will be able to get a kidney transplant will end your medical problems. Transplants have rejection issues and they have all kinds of issues, and those issues are life-long and I recognize that. I do believe that the Bureau of Prisons is capable in its medical facilities of dealing with many of those issues, including dialysis if it has to be. If a transplant doesn't come through and it

8

> has to be, it is my hope that by setting a long surrender date, you will be able
> to ameliorate the impact of the health conditions.
>
> That said, it is my belief that Ms. Goode's time in prison will be more
> difficult than the time spent by other people because of her health issues
> and the fallout from them. For that reason, I consider it appropriate to
> impose a variance sentence.

(Tr. 15-16). I sentenced Goode to 48 months' imprisonment and allowed her to remain out an additional eight months. She never received a transplant. She surrendered and commenced her sentence in February 2018.

### Goode's Request to the BOP for Compassionate Release

In December 2018, Goode submitted a "Compassionate Release Request" to the BOP at FMC Carswell based on her medical conditions, which include what Goode has described as "end stage renal disease," "renal anemia," "hyperthyroidism," "hypertension," as "Stage Five renal failure." (Mot. at 2). On January 9, 2019, the BOP denied that request because "currently, you do not meet the criteria for a Reduction in Sentence based on Medical Circumstances – Terminal Medical Condition" noting, in particular, that Goode did not have a life expectancy of 18 months or less and was capable of independent living within the BOP facility. (Dkt. 489, Ex. A at 1). Goode filed an appeal of the denial, which was denied for substantially the same reasons by the Warden on February 20, 2019. (*Id.* at 2-3).

According to the medical director, Dr. Charles Langham, the request was denied because Goode does not meet BOP "terminal medical criteria." According to Dr Langham:

> I have reviewed Ms. Goode's Bureau of Prisons Electronic Medical Records. Ms.
> Goode has a medical history of hypertension, anemia, dependence on dialysis, and
> chronic lower back and knee pain. She currently undergoes dialysis treatment
> three times per week and is evaluated by a contract nephrologist every two weeks.
> Ms. Goode is presently responding well to dialysis treatment. Presently, Ms.
> Goode's life expectancy is greater than eighteen months and she does not have an
> end of life trajectory. Additionally, based on my review of the available records,
> there has not been a recommendation for Ms. Goode to undergo a kidney

9

transplant. In the event that Ms. Goode were deemed a good candidate for a kidney transplant and an appropriate organ donor were identified, the BOP has procedures for consideration of organ transplantation outlined in the BOP's Program Statement 6031.04, Patient Care.

At this time, based on my review of records, Ms. Goode does not meet the criteria of a terminal medical condition under the BOP's Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g).

(Letter from Charles Langham, M.D. dated October 21, 2019 (Govt. Exhibit A).

Goode appealed the facility's determination to the BOP Regional Director. The Regional Director denied the appeal noting:

As the Warden explained, staff reviewed your case and determined you were inappropriate for RIS. Although you have serious medical conditions, your conditions do not meet terminal criteria, you independently perform activities of daily living, and you have no functional limitations.

(Letter from Eric D. Wilson, Acting Reginal Director, dated April 5, 2019).

### Goode's Motion for Compassionate Release in the District Court

On September 5, 2019, Goode filed the instant motion with the Court for a sentencing reduction pursuant to 18 U.S.C. § 3582 and the First Step Act. (Dkt. 489). She claims that "hypertension kidney disease [] has destroyed her kidney function and has left [her] in End Stage Organ Failure needing a kidney transplant." Goode says that she is in need of a transplant and "has siblings that are willing to donate a kidney" but that "FMC Carswell is not able to offer to the Defendant a kidney transplant." (*Id.* at 3-4). In a reply letter to the Court, Goode takes issue with Dr. Langham's suggestion that kidney transplant was not indicated:

The reason that the specialist will not recommend a transplant for Ms. Goode is because the contract doctors that work for the Bureau of Prisons are not permitted to go outside the scope that the Bureau of Prisons has in place without the permission from Washington. If this contract doctor was seeing Ms. Goode in the real world he most certainly would have recommended a transplant to cure her

10

> disease when one came available.
>
> ...
>
> [I have] been receiving dialysis treatments for the past 3 years. . . . [and] deteriorating more and more every day. Ms. Goode now spends 24 hours a day in a wheel chair because of bone issues in her knees and back. Ms. Goode is experiencing bone and muscle deterioration because her kidney disease causes weakening of the joints and bones because her body does not supply the calcium her bones need to keep them strong. This cause brittle and soft bones making her susceptible to broken hips and knees. When Ms. Goode arrived at FMC Carswell she was not in a wheel chair and will spend the rest of her life in a wheel chair until she can get a transplant. After a transplant Ms. Goode will have months if not years of rehabilitation to strengthen her bones and muscles so she may some day walk again. So when Dr. Langham in his letter states she is responding well to dialysis, I guess if you think that responding well from a wheel chair is responding well than I would think that is his opinion but not the opinion of the woman that when she arrived here could walk but is now confined to a wheel chair.

(ECF #492, Goode Reply Letter, dated November 5, 2019).

With respect to the Section 3553(a) factors, Goode notes that she "is a non-violent offender and has learned her lesson" adding that since sentencing she has "married a Pastor of her church and fully intends on following the laws of society and of the church." (*Id.* at 5).

In opposing the motion, the Government relies principally on Goode's BOP medical records and the representation of BOP physician, Charles Langham, that Goode does not meet the criteria for compassionate release based on her medical condition.

The Court agrees.

Goode has not shown that she has a terminal illness or a serious physical or medical condition that has substantially diminished her ability to provide self-care within the environment of a correctional facility. While it is true that Goode has what can be described as a "terminal illness" in the sense that her kidney disease is unlikely to be fully cured, her disease is treatable, she is responding well to that treatment, and she does not have an "end of life trajectory." *See* Langham letter. The "terminal" nature of Goode's condition is no different

than it was when this Court imposed sentence– she had been diagnosed with "end stage kidney disease" and was receiving dialysis.

Nor has Goode demonstrated that "serious physical or medical condition[s]" or "serious functional or cognitive impairment[s]" have "substantially diminishe[d] [her] ability . . . to provide self-care within the environment of a correctional facility." *Id.* While Goode contends there has been deterioration in her condition, the BOP reports indicate that she is responding well to treatment (granted, BOP has a different interpretation of "well" than does Ms. Goode). And the record has not established she is incapable of self-care while incarcerated. That alone provides sufficient basis for the Court to deny any motion for release based on the "Medical Condition of the Defendant." *See, e.g.*, *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3082202, at *2 (S.D. Ala. July 15, 2019) (denying defendant's motion for compassionate release because "the record lacks any evidence that his ability to care for himself in prison has been substantially diminished"); *United States v. Heromin*, No. 8:11-CR-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (concluding that defendant had failed to demonstrate "a foundation for compassionate release based on his medical condition" because his medical provider did not indicate that defendant's medical conditions were either terminal or resulted in an inability "to 'provide self-care' within the correctional facility").

I discounted Goode's sentence by more than eight years below the bottom of her Guidelines range, principally because of her poor renal health. Considering her diagnosis, prognosis and treatment are essentially the same as at the time of sentencing, no further reduction is warranted.

12

In regard to Goode's assertions that she is an appropriate candidate for a kidney transplant, she has family members who are prepared, willing and compatible donors, and that BOP is unable or unwilling to provide the procedure, there is nothing in the defendant's medical records to suggest that she is indeed a candidate for transplant, or has been identified a specific donor. Goode made substantially the same claim at the time of sentencing, one which caused this Court to set an extended surrender date, so Goode could have the transplant. She never had the transplant. BOP has represented that it will provide transplant surgery to appropriate candidates. Ms. Goode should provide BOP with the name of the family member who is willing to give her a kidney.[1]

Even assuming Goode satisfies one of the categories for compassionate release, a further reduction in her already significantly reduced sentence would tend to undermine the sentencing goals set forth in Section 3553(a). Goode, who has a significant criminal history, was a substantial participant in a massive oxycodone distribution scheme. Her medical condition was already factored into her sentence—a sentence that varied drastically downward from the applicable Guidelines range, and more importantly, from the range of sentences imposed on other, similarly situated defendants in the same scheme. As long as the BOP is capable of caring for her medical needs, Goode should serve out the balance of her sentence.

---

[1] I grant defendant leave to write this Court if (1) she provides BOP with medical documentation that a viable donor has been identified (a specific person who has been medically cleared as a match), and (2) BOP refuses to entertain her request for transplant surgery.

This constitutes the order of the Court.

Dated: January 3, 2020

_____
Colleen McMahon
Chief Judge

Ganeene Goode, Registration No.: 39456-054
FMC CARSWELL
FEDERAL MEDICAL CENTER
P.O. BOX 27137
FORT WORTH, TX 76127